# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 21-351

**BELINDA GARRETT**

**VERSUS**

**DG LOUISIANA, LLC**

**********

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 2018-0070
HONORABLE RONALD F. WARE, DISTRICT JUDGE (On the Merits) and
HONORABLE KENDRICK J. GUIDRY, DISTRICT JUDGE (Motion to Annul)

**********

**JOHN E. CONERY**
**JUDGE**

**********

Court composed of Billy H. Ezell, John E. Conery, and Van H. Kyzar, Judges.

**AFFIRMED.**

**Damon L. Beard**
**Jackson T. Brown**
**David H. Hanchey**
**Hannah E. Mayeaux**
**The Townsley Law Firm, LLP**
**3102 Enterprise Boulevard**
**Lake Charles, Louisiana  70601**
**(337) 478-1400**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
     **Belinda Garrett**


**John C. Turnage**
**Mayer, Smith & Roberts, L.L.P.**
**1550 Creswell**
**Shreveport, Louisiana  71101**
**(318) 222-2135**
**COUNSEL FOR DEFENDANT/APPELLANT:**
     **DG Louisiana, LLC**

**CONERY, Judge.**

Plaintiff Belinda Garrett (Ms. Garrett) filed suit against DG Louisiana, LLC (Dollar General) after allegedly sustaining injuries in a fall at its Sulphur, Louisiana Dollar General Store. Dollar General denied Ms. Garrett's claim that her fall was caused by a wet floor at the entrance of the store. Following a bench trial, the trial court found Dollar General liable and entered a judgment finding Ms. Garrett proved damages of more than $100,000.00. Due to a pre-trial stipulation, the trial court rendered judgment in favor of Ms. Garrett and against Dollar General in the amount of $50,000.00, plus interest and costs. Dollar General appeals, questioning the trial court's determination of fault as well as its qualification of Ms. Garrett's expert in safety engineering. For the following reasons, we affirm.

## FACTS AND PROCEDURAL HISTORY

Ms. Garrett explained that the November 1, 2017 slip-and-fall accident at issue in this appeal occurred after a very short walk from her car to the entrance of the Dollar General. Ms. Garrett testified that it was "raining and drizzling" when she arrived at the store at 11:20 a.m. Other witnesses corroborated her testimony.

When asked to explain what happened upon arrival, Ms. Garrett testified that, "I walked in. I saw a buggy to my left. I went to go get it. And next thing I know, I - - my foot hit something that was slick, and I went down." The series of events

was captured on surveillance video which was reviewed on the witness stand by those appearing at trial.[1]

The witnesses explained that, upon crossing the threshold of the store's entrance, Ms. Garrett stepped onto the floor mat located inside of the doorway and turned to her left, as the shopping carts provided by the store were close to the door.[2] Ms. Garrett testified that after she fell, she noted that the area where she slipped and fell was wet and that the back of her pants became wet from the fall.

Ms. Garrett stated that she immediately began hurting and that her left hand started swelling. Ms. Garrett was assisted by Store Manager Ernesto Romero, the **only employee on duty at the store at the time of the fall**. Ms. Garrett alleged that although her pain continued to increase to a point of "major pain" in her left shoulder and elbow, she remained in the store for an additional forty-five minutes to complete an accident report at Manager Romero's request.

---

[1] The parties introduced the video surveillance as Exhibit J-1. Although the appellate record includes Exhibit J-1, both files contained on the corresponding disc are in the "AVI" format and are not reviewable by this court. Instead, Third Circuit Internal Rule 31 requires that "[a]ll electronic audio and video evidence submitted to the court shall be in the Windows Media Audio (WMA) or Windows Media Video (WMV) format to ensure that the evidence can be played on the default Windows Media Player[,]" or that, in the event the audio or video cannot be converted, "the software or codec required to view the evidence must be provided."

Via the Clerk of Court, the parties were allowed to resubmit the exhibit. The subsequently produced disc, however, again contained only "AVI" files and is again unreviewable despite the submission procedures of Third Circuit Internal Rule 31 and despite the rule's proviso that "It is the exclusive responsibility of counsel for all parties to ensure that all electronic audio and video evidence works properly before submitting it to the court."

Moreover, in proceeding with review, we are mindful that as the appellant, Dollar General is charged with the responsibility of the completeness of the record. *See Brown v. La. Dep't of Pub. Safety & Corr.*, 19-0853 (La.App. 1 Cir. 2/21/20), 296 So.3d 619. Thus, the inadequacy of the record is imputable to it. *See id. See also State in the Int. of E.A.D.*, 18-451 (La.App. 3 Cir. 7/2/18), 250 So.3d 1237; *Werner Enters., Inc. v. Westend Dev. Co.*, 563 So.2d 540 (La.App. 5 Cir. 1990).

[2] *See* Exhibits D-3 and D-4, both pictures of the interior of the store's entrance. D-3, which shows the floor mat, indicates that the shopping cart was immediately to the left as Ms. Garrett entered the store. D-4 shows Ms. Garrett walking to the cart.

Due to her increasing pain, Ms. Garrett travelled to the emergency room at an area hospital, where she was treated and released with her arm in a sling, with instructions to place ice on her elbow. Ms. Garrett thereafter began treating with Dr. Brett Cascio, an orthopedic surgeon. Dr. Cascio provided an initial diagnosis of rotator cuff tear, hand contusion, elbow contusion, and lumbar spine strain. After Ms. Garrett underwent an MRI, Dr. Cascio recommended ulnar nerve decompression surgery and, with regard to the shoulder, recommended a left orthoscopic rotator cuff repair. Following review of the videotape of Ms. Garrett's fall, Dr. Cascio opined that the fall caused her injuries and, upon questioning by Ms. Garrett's counsel, explained:

> Q. Does this type of fall - - is this type of fall the type of mechanism that would cause injuries to her left shoulder, left elbow, left hand?
>
> A. Yes.
>
> Q. Are you able to give us your opinion, to a reasonable degree of medical certainty, as to what caused the injury to Ms. Garrett's left shoulder?
>
> A. I think her falling on her arm caused her tear.
>
> Q. And are you able to give your opinion as to what caused her left elbow and left hand injuries?
>
> A. Yeah, I agree. The same fall as far as I know.

Although Dr. Cascio recommended surgery, Ms. Garrett did not undergo the recommended surgical procedures. She cited her lack of financial resources to meet the deductible of her personal insurance.

Ms. Garrett timely filed suit in January 2018 and named "DG Louisiana, LLC," a wholly owned subsidiary of Dollar General Corporation, as the only defendant. She alleged that the injuries she sustained on its store premises in

Sulphur were caused by its sole fault and negligence in various respects.[3]  She

alleged injury to her body as whole, including that to her left elbow, shoulder and

left arm, neck, and back.  She accordingly sought damages for "general damages,

special damages, lost wages, future lost wages, loss of enjoyment of life, past,

present and future medical expenses and pain and suffering, attorney's fees, costs

of these proceedings and interest thereon."

Dollar General initially requested a jury trial. Ms. Garrett later stipulated,

however, "that the matter in controversy does not exceed the sum of FIFTY

THOUSAND DOLLARS ($50,000.00)":

> BELINDA GARRETT further agrees and does stipulate that, in the
> event that an award greater than FIFTY THOUSAND DOLLARS
> ($50,000.00) is made in her favor by any court or other authority at
> any time then she will not accept and will not be entitled to any
> amount in excess of FIFTY THOUSAND DOLLARS ($50,000.00).

Such a stipulation allowed Ms. Garrett to request a bench trial.  *See* La.Code Civ.P.

art. 1732.[4]

---

[3] By her initial petition, Ms. Garrett alleged negligent acts of:  1) Failure to maintain the premises in a safe condition; 2) Failure to inspect the premises to insure against unsafe conditions; 3) Failure to warn customers of unsafe conditions on the premises; 4) Failure to properly patrol and supervise the premises; 5) Allowing the premises to become dangerous without taking precautions to safeguard the safety of their customers; 6) Failure to properly clean and maintain and inspect the floors; 7) Failure to have proper rugs and/or matting set up at the entrance of the store; 8) Failure to keep public walking areas clear of any slipping hazards; 9) Failure to properly train employees regarding rug placement in public walking areas; and 10) Any other acts of negligence known only to defendant which may be found during discovery proceedings and which may be proved at a trial.

[4] As applicable to this case, La.Code Civ.P. art. 1732 provides, in part, that:

> A trial by jury shall not be available in:
>
> (1)     A suit where the amount of no individual petitioner's cause of action exceeds fifty thousand dollars exclusive of interest and costs, except as follows:
>
> (a)     If an individual petitioner stipulates or otherwise judicially admits sixty days or more prior to trial that the amount of the individual petitioner's cause of action does not exceed fifty thousand dollars exclusive of interest and costs, a defendant shall not be entitled to a trial by jury.

The matter proceeded to a bench trial before Judge Ronald F. Ware in December 2020. At trial, Ms. Garrett testified on her own behalf, explaining the circumstances of her fall. Ms. Garrett also called, among others, Dollar General's District Manager Mark Fitzwater and Manager Romero as witnesses. District Manager Fitzwater testified regarding Dollar General's standard operating procedures for the investigation of accidents as well as those for ensuring the safety of its floors on rainy days. Manager Romero testified regarding his use of mats on the rainy day of the accident, noting that he placed one mat on the exterior side of the entrance threshold and another on the interior. He explained that he placed the interior mat lengthwise from the interior threshold so as to maximize the area for customers to dry their feet upon entering. He also testified that he locked one of the entrance doors so as to channel patrons onto the indoor mat.[5] Although at trial Manager Romero denied finding that the area was wet at the time of Ms. Garrett's fall, he was presented with the accident report he completed at the time of the fall, which, as more fully set forth below, cited as a "Cause of Incident … wet conditions including wet floor."

In addition to Dr. Cascio's expert testimony attributing the medical causation of Ms. Garrett's injuries to the fall, Safety Engineer Jason English presented expert testimony in his field regarding Dollar General's practices on the day of the accident. After Ms. Garrett rested her case, the trial court denied Dollar General's motion for involuntary dismissal.

---

By 2020 La. Acts, 1st Ex. Sess., No. 37, the legislature lowered the applicable figure from $50,000.00 to $10,000.00. The Act's provisions however are applicable only prospectively and do not apply to causes of action arising or pending prior to January 1, 2021. *Id.*

[5] District Manager Fitzwater testified the mats were 3 × 5 feet.

In its defense of the claim, Dollar General recalled District Manager Fitzwater and Store Manager Romero, who were each questioned as to the store's practices on the day in question to counter Ms. Garrett's assertion that that she fell due to a wet floor. Although Ms. Garrett's safety engineering expert, Mr. English, had suggested that areas of the mat appeared dark on the video, likely evidencing saturation, Manager Romero denied having noticed any such saturation. On redirect examination, however, Manager Romero was presented with his contemporaneously prepared accident report. Under the form's query regarding the "cause" of the incident, Manager Romero listed "**wet conditions including wet floor[.]**" (Emphasis added.)

At the close of trial, Judge Ware took the matter under submission. The record contains neither oral nor written reasons for ruling. Judge Ware ultimately rendered a December 30, 2020 judgment[6] in favor of Ms. Garrett and against Dollar General, assessing damages as follows:

> $30,000.00 for pain and suffering
> $20,000.00 for loss of enjoyment of life
> $10,270.62 for past medical bills and treatment
> $63,567.54 for future medical bills

(Emphasis removed.) The final judgment rendered recognized that Ms. Garrett stipulated that "the amount in controversy does not exceed fifty thousand dollars ($50,000.00), exclusive of judicial interest and court costs[,]" and Dollar General was cast in judgment in that amount.

---

[6] A supplemental volume of this appeal indicates that Judge Ware initially signed a December 29, 2020 judgment, which did not account for Ms. Garrett's stipulation that the amount in controversy did not exceed $50,000.00. The following day, however, Judge Ware signed the December 30, 2020 judgment now on appeal recognizing the stipulation. The appeal in this case was taken from the December 30, 2020 judgment.

## ASSIGNMENTS OF ERROR

Dollar General appeals, assigning as error:

**Assignment of error no. 1:**

> The trial court erred in finding that [Dollar General] was at fault in causing the plaintiff's slip and fall that is the subject matter of this litigation;

**Assignment of error no. 2:**

> The trial court erred in admitting Jason English as an expert in safety [engineering];

**Assignment of error no. 3:**

> Alternatively, if the court finds that [Dollar General] was in any way at fault, the trial court erred in not finding the plaintiff to be comparatively at fault in causing the slip and fall.

## LAW AND DISCUSSION

*Assignment of Error 1 – Causation*

With regard to merchant liability, La.R.S. 9:2800.6 provides:

A. A merchant owes a duty to persons who use his premises to exercise reasonable care to keep his aisles, passageways, and floors in a reasonably safe condition. This duty includes a reasonable effort to keep the premises free of any hazardous conditions which reasonably might give rise to damage.

B. In a negligence claim brought against a merchant by a person lawfully on the merchant's premises for damages as a result of an injury, death, or loss sustained because of a fall due to a condition existing in or on a merchant's premises, the claimant shall have the burden of proving, in addition to all other elements of his cause of action, all of the following:

(1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.

(2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.

(3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal

7

uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.

Accordingly, Ms. Garrett was required to demonstrate that Dollar General failed to exercise reasonable care in keeping its floor in a reasonably safe condition and to keep the store free of hazardous conditions. *See Thompson v. Winn-Dixie Montgomery, Inc.*, 15-0477 (La. 10/14/15), 181 So.3d 656. In the event she proved that breach of duty, she was further required to prove that the breach caused her fall/injuries, that the alleged condition presented an unreasonable risk of harm, that Dollar General had actual or constructive notice of the hazardous condition (water on the floor), and that it failed to exercise reasonable care. *Id.*

Although the appellate record does not include reasons for ruling or an articulation of findings of fact, "'appellate courts review judgments, not reasons for judgment.'" *See Wooley v. Lucksinger*, 09-0571, p. 77 (La. 4/1/11), 61 So.3d 507, 572 (quoting *Bellard v. Am. Cent. Ins. Co.*, 07-1335, p. 25 (La. 4/18/08), 980 So.2d 654, 671).

Furthermore, the trial court's path in rendering an award in favor of Ms. Garrett and against Dollar General under La.R.S. 9:2800.6 is reasonably discernable from the record on review. *See Leal v. Dubois*, 00-1285 (La. 10/13/00), 769 So.2d 1182. Accordingly, the deferential manifest error standard, as applicable to merchant liability cases brought under La.R.S. 9:2800.6, is applicable in this case. *See id.*; *Pierite v. DG Louisiana, LLC*, 18-149 (La.App. 3 Cir. 11/7/18), 258 So.3d 901, *writ denied*, 19-0127 (La. 3/18/19), 267 So.3d 93. This standard of review extends to attendant credibility determinations and reasonable inferences of fact. *Pierite*, 258 So.3d 901. In the event the trial court's findings are reasonable upon the reading of the entirety of the record, a court of appeal may

8

not reverse the trial court's ruling even if convinced that it would have weighed the evidence differently had it been sitting as the trier of fact. *Id.*

Dollar General questions the trial court's findings as to only two of the above elements of La.R.S. 9:2800.6[7] and asserts that the trial court was manifestly erroneous in finding that Ms. Garrett satisfied her burden of proving either. First, Dollar General contends that Ms. Garrett failed to prove that her fall was caused by "a condition (water)" on its premises. Second, it argues that she failed to prove that Dollar General did not take reasonable protective measures, *i.e.*, that it did not exercise reasonable care. We take each of these in turn.

Condition presenting an unreasonable risk of harm

Dollar General acknowledges the rainy, drizzly conditions of the day and notes that the video surveillance "clearly shows the plaintiff with an umbrella in her left hand as she entered the store, which she had collapsed or was in the process of collapsing, and shows her placing it in the area where she fell immediately before she fell." Nevertheless, Dollar General contends that "[t]here is no evidence whatsoever to support a finding that there was water on the floor prior to the plaintiff coming into the store." It denies that any such condition can be seen on the video or in pictures introduced into evidence. Additionally, it notes, Manager Romero testified that he was only 8-10 feet away and that he denied having identified water on the floor, explaining that he would have remedied any such situation immediately. Rather than the water pre-existing Ms. Garrett's arrival, Dollar General posits, it is "[j]ust as plausible," "that the umbrella that she

---

[7] Dollar General does not address issues of medical causation or notice. We therefore consider any such potential arguments waived.

held in her left hand caused water to be on the floor (although there is really no evidence that there was water on the floor at all)."

Contrary to Dollar General's position, however, Ms. Garret plainly testified regarding the presence of water on the floor and that her clothes were wet after the fall. She further reviewed the video at trial and noted times in the video where she explained that she was pointing out the wet area to Manager Romero after he is seen arriving to assist her and that she is subsequently seen warning another customer who was entering the area. Additionally, Jason English, who was accepted as an expert in safety engineering as discussed further below, also testified as to images on the video that he identified as areas of the mat that had become saturated due to the rainy conditions, and what he described as an insufficient use of drying mats on the rainy morning.

With regard to Manager Romero's denial at trial that the floor was wet, the trial court was aware that his testimony occurred more than three years after the fall. Additionally, on cross examination, Manager Romero's testimony was impeached, and he acknowledged that during his May 2019 deposition, he could not "confidently testify" as to the condition of the store's entrance at the time of the fall due to the passage of time. Further impeaching his trial testimony, Manager Romero was presented with the "Customer Incident Report," which he completed on the date of the fall. Again, this contemporaneously completed report, bearing Manager Romero's signature, provides as follows:

**Describe the Incident in Detail:**

Customer slipped on tile floor upon walking in from exterior of building (wet rainy conditions)

. . . .

**Cause of Incident; (struck by, repetitive slip, etc)**

**Wet conditions including wet floor**

(Emphasis added.)

Finally, on questioning regarding the images in the video, Manager Romero confirmed that he could see wetness in the video but felt that it was only from the bottom of Ms. Garrett's shoes[8] and only in the area where she had walked. He

---

[8] At oral argument, defense counsel mentioned that Ms. Garrett was wearing "cheap flip-flops" and that her failure to wipe her feet, which he alleged were wet from walking outside in the rain, was the cause of her fall. When Ms. Garrett was asked at trial to describe the shoes she was wearing that day, she replied:

> A.  I had on some really nice flip-flops which I wear all the time even here when it's raining up and down the big steps. Been doing that for years.
>
> Q.  And have you ever slipped while wearing these flip-flops before?
>
> A.  No, sir.

Mr. English, Ms. Garrett's expert in safety engineering, was also questioned regarding Ms. Garrett's footwear and explained upon questioning by counsel for Ms. Garrett as follows:

> Q.  There's no requirement that customers must wear specific shoes in order to shop in this Dollar General, is there?
>
> A.  Not that I'm aware of. No.
>
> Q.  There's no sign saying that if you have flip-flops on, then you're not allowed to enter the store?
>
> A.  It would eliminate a large portion of their customers if they did that.
>
> Q.  So, Dollar General has to anticipate that patrons could wear flip-flops even on a rainy day when they enter the store?
>
> A.  Yes. Flip-flops are very common footwear.
>
> Q.  They should have a system in place that protects all customers and patrons that are in the store?
>
> A.  Yes.

acknowledged that he could be seen in the video pointing to something after he came to Ms. Garrett's assistance. He could not recall, however, what he was pointing at.

The trial court heard and considered the testimony of Manager Romero regarding the "busy" nature of the rainy morning, the high traffic nature of the area where the accident occurred and the lack of staffing at the time. Mr. English explained to the trial court that, from the video he was shown, he counted fifty six (56) customers enter the store before Ms. Garrett entered the store from "the wet parking lot." He testified that customers "would be tracking in anything that was in the parking lot; water, dirt, mud, oils, anything else that's going to be on an open outdoor parking lot." He explained that shopping carts were a source of water and that several can be seen on the video being brought into the store. Given these conditions, Mr. English opined, the store needed a heightened inspection program. Manager Romero, however, was the only employee on duty in the store at the time and was positioned at the cash register.

The trial court was given opposing testimony regarding the floor's condition at the time of the fall. Given Ms. Garrett's positive testimony that she slipped because there was water on the floor and she experienced wetness on her clothes after the fall, together with Mr. English's expert opinion on areas of saturation of the floor mat and water on the floor adjacent to the mat, as well as the contemporaneous incident report, we find no manifest error in the trial court's ruling. *See, e.g., Blackman*, 966 So.2d 1185.

Failure to Exercise Reasonable Care

Many of these same factors support a conclusion that Dollar General failed to exercise reasonable care on the day in question. Dollar General, however, argues that its measures were reasonable, pointing out that "Mr. Romero testified as to what he did, and Mark Fitzwater, the District Manager, testified that these actions comported with requirements of [Dollar General]." Namely, Manager Romero "locked and made inoperable one of the doors so that traffic coming in the store would go through one door." He further "elongated the [entrance floor] mat so that customers would have a longer time on the mat to wipe off their feet." He also "placed a wet floor sign at the end of the mat to remind customers that it was raining and they needed to exercise caution." Dollar General also suggests that Manager Romero, being 8-10 feet from the door, "was positioned to look at the area where customers were coming in and out and he did this on a constant basis while checking out customers." The record is devoid of evidence as to how Manager Romero could simultaneously look at the items being purchased by customers, handle or scan each item, accept payment, bag the items, and watch each customer enter the store; not to mention the myriad other duties required of him in operating the store.

While Manager Romero explained that he locked one door and elongated the mat in order to maximize the available area for patrons to dry their feet, he further explained that the store only had one interior mat. It did not have multiple mats for use on a rainy day. Mr. English found Dollar General's practice or "protocol" inadequate, citing multiple safety codes in support of his testimony. Upon viewing the video, he identified areas of saturation on the mat and explained that the type of floor tiles seen in the video become slippery. Finally, Mr. English discounted

13

Dollar General's use of the single "wet floor" sign. He suggested instead that such signs at an entrance "don't do a whole lot[,]" and that multiple signs would be needed at such a high traffic area. As for Manager Romero's lone presence in the store that morning, Mr. English explained:

> [O]bviously on an inclement weather day, if you only have one employee and that employee is going to be having to do everything in the store including running the cash register, then you're likely not going to be able to have the staffing to have a heightened inspection program or to clean up any excess water that may come in the doors. So it's just another factor that's going to lead to a higher risk of water getting on your hard surface flooring.

Our review of the record supports the trial court's finding of Dollar General's liability, in particular its failure to exercise reasonable care. While Dollar General points to several cases in support of its position, we find each case readily distinguishable from the present matter. *See Melancon v. Popeye's Famous Fried Chicken*, 10-1109 (La.App. 3 Cir. 3/16/11), 59 So.3d 513; *Lee v. Ryan's Family Steak Houses, Inc.*, 06-1400 (La.App. 1 Cir. 5/4/07), 960 So.2d 1042, *writ denied*, 07-1577 (La. 10/12/07), 965 So.2d 405. Both cases were ones in which a patron sought to impose liability on **a restaurant** where "wet floor" signs were in use to signal customer's attention to the fact that the floor had been mopped.

Importantly, *Melancon*, 59 So.3d 513 proceeded to the appellate panel as a summary judgment and was thus reviewed *de novo*; not by the deferential manifest error standard.[9] Conducting its review as such, the *Melancon* panel rejected the plaintiff's position that a restaurant should only mop its floors after hours, stating

---

[9] After the parties' briefing deadline closed in this matter, this court rendered *Rogers v. Walk-On's Bistreaux & Bar*, 21-181 (La.App. 3 Cir. 10/6/21), _ So.3d _, (2021 WL 4592371). Like the present case, the plaintiff in *Rogers* sought recovery for a fall under La.R.S. 9:2800.6, albeit on **a restaurant floor** at the opening of the business day rather than at the entrance of a grocery and general merchandise store during inclement weather. Like *Melancon*, *Rogers* was considered under the *de novo* standard as it involved review of a summary judgment. Following that review, the panel reversed the trial court's entry of summary judgment in favor of the defendant restaurant upon a finding that genuine issues of material fact remained.

that such a requirement would place "an unreasonable duty" on store owners as "[t]here are a multitude of reasons, including patron safety, requiring that store owners clean up various spills on their floors and provide a clean environment." *Id.* at 516. The panel specifically remarked that "[j]urisprudence has specifically found that mopped floors do not create an unreasonable risk of harm when the appropriate signage is used to warn patrons of the condition of the floor." *Id.* Obviously, the present case is not one in which the "wet floor" signs were in use to warn of a mopped floor, a necessity in a store's operation. Rather, Ms. Garrett's case was based upon the dangerous condition of the wet floor at the store's entrance during rainy weather, inadequate signage, inadequate staffing and inspection, and failure to correct a hazardous condition.

In *Lee*, 960 So.2d 1042, the first circuit did, in fact, find manifest error in a trial court's determination that the plaintiff demonstrated that the defendant restaurant created an unreasonable risk of harm given the circumstances surrounding its placement of a warning cone before a freshly-mopped area. However, the panel's reversal of the trial court's finding was based, at least in part, on the fact that, despite its finding regarding the cone, the plaintiff testified that she noticed that the floor was slippery "and saw the water on the floor *before* she began walking back through the wet area. Therefore, the placement and design of the cone were of no consequence in alerting" the plaintiff to the condition. *Id.* at 1047. The situation in *Lee* is again inapposite to this case. First, the restaurant in *Lee* was attempting to address a pre-existing condition on its floor whereas Dollar General allegedly failed to adequately respond to continuing and existing dangerous conditions. Further, the plaintiff in *Lee* twice walked through the subject area despite her knowledge of its wet and slippery condition, whereas in

15

this case, the record does not reflect that Ms. Garrett had knowledge that the area outside of the floor mat was wet.

Finally, Dollar General references *Montesino v. P.A. Menard, Inc.*, 588 So.2d 704 (La.App. 4 Cir. 1991), *writ denied*, 592 So.2d 1337 (La.1992), for the proposition that requiring a store owner to ensure a dry floor during rainy conditions would impose an impossible and unreasonable standard of care. *Montesino*, however, involved a patron who fell after entering a **grocery warehouse through the rubberized curtains of the store's loading bay rather than its entrance**. The warehouse, which did not conduct business through retail trade, took orders over the phone. The loading bay area where the plaintiff entered was "posted" with a sign prohibiting rear-door entries. The panel determined that under the circumstances, the "plaintiff was not an invitee but was in a prohibited area which was clearly posted." *Id.* at 707. Citing all of these circumstances, as well as the defendant's maintenance procedures within the warehouse, the fourth circuit found that the defendant was not negligent in its operations during rainy conditions and concluded that the plaintiff "should proceed with greater caution than on a sunny day, particularly in the area where she walked on either side of the rubberized curtain." *Id.* at 708.

In this case, Ms. Garrett was obviously an invitee, she entered through the designated store entrance and was involved in a slip and fall in the very area designated for customer use when, upon entering the store, she immediately turned to her left to access a shopping cart placed in that position by Dollar General for customer use.

For these reasons, we leave the trial court's imposition of liability on Dollar General undisturbed.

16

*Assignment of Error 2 - Expert Testimony*

Dollar General further contends that the trial court erred in admitting Mr. English as an expert in safety engineering and in relying on his opinion regarding the store's use of safety measures. It suggests that Mr. English's testimony was unreliable as he did not interview Ms. Garrett and that his opinions were based solely on his review of the surveillance tape. It also contends that, although he expressed opinions regarding the store's use of mats, he was not expressly admitted for that purpose.

Counsel for Dollar General objected to the tender of Mr. English in the field of safety engineering on two bases, stating:

> First of all, I do not believe an expert is necessary when we have the entire two hours before - - an hour before and an hour after from two angles as to what happened, whether or not Ms. Garrett was acting safely, maintaining a guard for her own safety. It's all laid out in front of us. An expert is not necessary for that one way or the other, Your Honor.

> And the second basis is that the qualifications that he has do not necessarily go to matting. There's no standard for it. It's just - - there's no basis for that testimony in that regard.

In accepting Mr. English as an expert, the trial court rejected Dollar General's argument and explained:

> Okay. I'm going to overrule the objection. Expert testimony is, if it can lend assistance to the trier of fact, then it's proper. And I think testimony's been pretty clear that there's been experience and some level of training with respect to Mr. English with respect to matting and walking surfaces. We have a matting question here, but we also have an unmatted area with walking surface. So, I think the expert testimony would assist the Court. So, I'm going to overrule the objection. And I'm going to recognize Mr. English as an expert in the field of … Safety Engineering.

Louisiana Code of Evidence Article 702 provides for the testimony of experts and indicates, in part, that:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (1) The expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (2) The testimony is based on sufficient facts or data;
>
> (3) The testimony is the product of reliable principles and methods; and
>
> (4) The expert has reliably applied the principles and methods to the facts of the case.

Referencing Article 702, the supreme court explained in that:

> [A] district court is afforded broad discretion in determining whether expert testimony is admissible, and its decision with respect thereto shall not be overturned absent an abuse of that discretion. *Cheairs*, [v. *State ex rel. Dep't of Transp. & Dev.*, 03-0680, 861 So.2d 536, 541] (citing *State v. Castleberry*, 98-1388 (La. 4/13/99), 758 So. 2d 749, 776); *see also* C.E. art. 702, cmt (d) ("[b]road discretion should be accorded the trial judge in his determination as to whether expert testimony should be held admissible and who should or should not be permitted to testify as an expert."); *State v. Foret*, 628 So. 2d 1116, 1123 (La. 1993) ("The admission of the evidence [is] subject to the discretion of the trial judge.") (internal quotations omitted); *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 142, 119 S. Ct. 1167, 1171, 143 L. Ed. 2d 238 (1999) (finding the gatekeeping role of the district court recognized in *Daubert* applies to all forms of expert testimony).

> In exercising its gatekeeping duty, the district court must be mindful of the balancing of interests set forth in C.E. art. 403 – *i.e.*, whether the probative value of the expert testimony outweighs its prejudicial effect – as an expert's testimony can be misleading and prejudicial if this role is not properly satisfied. C.E. art. 403 ("Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or waste of time."); *see State v. Foret*, 628 So. 2d at 1122 (finding the use of Child Sexual Abuse Accommodation Syndrome-based testimony for the purpose of bolstering a witness's credibility creates a risk of prejudice that outweighs its questionable probative value).

*Blair v. Coney*, 19-0795, pp. 8-9 (La. 4/3/20), _ So.3d _, _.[10]

Necessity of Expert Opinion

Dollar General questions whether the trial court abused its discretion in admitting an expert to testify on the issue of causation. Its argument, however, is based on a false premise. As can be seen from its objection before the trial court, Dollar General focuses on Mr. English's opinion regarding Ms. Garrett's actions, not its own conduct. In its brief to this court, Dollar General similarly argues that:

> While Mr. English based his opinion simply upon review of the video without speaking to the plaintiff as to what she was doing, thinking, or asking her any questions about why she did not see the wet floor sign, did not utilize the rug, or to discuss how hard it was raining, whether she had walked through the rain, the types of shoes she had on, etc. He did not have the facts at his disposal to make opinion in regard to the duty of DG. His testimony should have been excluded.

Dollar General, however, was able to cross examine Ms. Garrett on all those issues. Ms. Garrett's counsel engaged Mr. English and called him to testify *as to Dollar General's practices* and to offer his opinion on **its** conduct as revealed by the video and by supporting evidence. To the extent Dollar General sought to establish the comparative fault of Ms. Garrett, it was incumbent on it to probe

---

[10] 2020 WL 1675992.

"whether or not Ms. Garrett was acting safely, maintaining a guard for her own safety[,]" as it urged in objecting to Mr. English's qualification.

Additionally, undermining Dollar General's contention that Mr. English's opinion was based solely on his review of the video, Mr. English explained to the court that he:

> reviewed the surveillance video associated with the fall, the entire video which is around 51 minutes before and then some time afterwards, about an hour. I reviewed the deposition of testimony prior to this trial of Ms. Garrett and then the two Dollar General representatives, Mr. Romero and Mr. Fitzwater. Reviewed some photographs, Dollar General policies and procedures. Let's see. I've looked through the various standards that address fall prevention matting and references. Then I listened to the witnesses' testimony live as well as primarily things I've reviewed off the top of my head, I believe.

Given Ms. Garrett's burden to establish breach of applicable merchant standards in her claim under La.R.S. 9:2800.6, and the trial court's articulated interest in hearing Mr. English's opinion on the topic, we do not find an abuse of discretion in the trial court's determination that expert testimony was required.

Qualification of Mr. English as a Safety Engineer

Dollar General's corresponding argument that the trial court abused its discretion in qualifying Mr. English as a safety engineer is similarly without merit and not supported by the record. In its objection at the trial court, Dollar General asserted that there was "no standard" to support Mr. English's testimony regarding the use of floor matting in the commercial setting. It continues that argument in its brief to this court, questioning Mr. English's methodology, stating: "He has no basis to say that there should have been more mats other than simply stating in his opinion that more were needed. He testified that there is no standard for how many mats should be in a store. (R. 283)."

20

Reference to record page 283, as urged by Dollar General, reviews the following colloquy:

>    Q.    Would you agree with me that building codes do not speak to a specific industry such as retail?
>
>    A.    You're talking about just the general building codes like the international building code?
>
>    Q.    Yes. Yes.
>
>    A.    That's correct. They are not limited to a specific industry. No.
>
>    Q.    And do those building codes that you have on your resume speak specifically about requirements on matting?
>
>    A.    You mentioned building codes. Could you be more … trying to understand what you're asking.
>
>    Q.    Do you know of any building codes that you've referenced - - let's see - - do you know of any building codes that speak specifically to matting?
>
>    A.    Well, just trying to - - are you talking like the actual A building code, like the international building code, just another - -
>
>    Q.    Yes. Yes.
>
>    A.    It does not speak specific to matting. It speaks to maintaining your floors to be slip resistant. So, it's a performance based standard. How you go about maintaining that performance is up to you. Matting is one option to use to maintain a slip resistant floor.

While Dollar General focuses on its own questioning regarding standards applicable to building codes as they may or may not relate to the use of mats in a commercial setting, the transcript otherwise evidences both Mr. English's credentials and the standards underlying his methodology. He described the field of safety engineering as a "broad umbrella," including those pertinent to his own work such as "fall prevention, both work place and public sectors, human factors, ergonomics, work place safety, premises safety, construction safety, machinery

particularly the safety aspects of machinery." He confirmed that his expertise also includes "cover walking," "working surfaces," and *floor matting*." (Emphasis added.) His CV, corroborated by his testimony, reveals both a Bachelor's Degree and a Master's Degree in safety engineering. Mr. English confirmed that he had given various presentations on walking surfaces, which included included topics of discussion such as floor matting. Mr. English estimated that he had been qualified as an expert 45-50 times.

Moreover, while Dollar General suggests that no standards exist for the use of floor matting, Mr. English listed three specific standards addressing fall prevention matting or entrance matting: 1) The American National Standard, titled the "Provision of Slip Resistance on Walking Working Surfaces" which, Mr. English stated, addresses floor mats; 2) The National Floor Safety Institutes, which Mr. English described as "the standard guide for commercial entrance matting in reducing slips, trips-and-falls"; and 3) the American Society of Testing Materials, "Standard Practice for Safe Walking Surfaces," which includes floor matting as a topic therein. Mr. English testified that he was a committee member in the development of the latter national standard. Furthermore, Dollar General's assertion that Mr. English is unqualified as he is not a certified Louisiana engineer ignores the fact that each of the identified standards is a national standard, and that he is a Board Certified Engineer in the State of Texas.

With these credentials identified for the trial court's benefit and Mr. English's obvious reference to several national standards pertaining to the use of floor matting, we find no merit in Dollar General's argument. The trial court's qualification of Mr. English in the field of safety engineering was not an abuse of discretion.

22

*Assignment of Error 3 - Louisiana Civil Code Article 2323 - Comparative Fault*

In its final and alternative argument, Dollar General questions the trial court's rejection of its argument that Ms. Garrett was, in the least, comparatively at fault. Dollar General suggests that Ms. Garrett should be assigned, if not 100% of the fault, up to 90% of the fault. It primarily argues that Ms. Garrett "knew of the danger of her conduct," and points to allegedly unreasonable conduct such as her knowledge that it was raining, walking through the parking lot with flip-flops, carrying a wet umbrella, and not wiping her feet on the floor mat at the door before stepping onto the store's tiled flooring. It contends that Ms. Garrett was "simply not watching where she was going and was not sufficiently prudent in making sure that the bottoms of her shoes were dry and that she could step as she did."

As the supreme court explained in *Fontenot v. Patterson Ins.*, 09-0669, p. 9 (La. 10/20/09), 23 So.3d 259, 267, it is indisputable that "more than one party may be at fault for the damages sustained" in a personal injury matter. That principle "is premised in Louisiana's comparative negligence scheme articulated in La.C.C. art. 2323." *Id.*

Louisiana Civil Code Article 2323 provides, in pertinent part:

> A. In any action for damages where a person suffers injury, death, or loss, the degree or percentage of fault of all persons causing or contributing to the injury, death, or loss shall be determined, regardless of whether the person is a party to the action or a nonparty, and regardless of the person's insolvency, ability to pay, immunity by statute, including but not limited to the provisions of R.S. 23:1032, or that the other person's identity is not known or reasonably ascertainable. If a person suffers injury, death, or loss as the result partly of his own negligence and partly as a result of the fault of another person or persons, the amount of damages recoverable shall be reduced in proportion to the degree or percentage of negligence attributable to the person suffering the injury, death, or loss.
>
> B. The provisions of Paragraph A shall apply to any claim for recovery of damages for injury, death, or loss asserted under any law

or legal doctrine or theory of liability, regardless of the basis of liability.

Like the factual findings attendant to the finding of merchant liability, explained above, a trial court's determinations regarding allocation of fault are factual in nature and are thus subject to the manifest error standard of review. *See Duncan v. Kansas City S. Ry. Co.*, 00-66 (La. 10/30/00), 773 So.2d 670. It should be noted that the trial court in this case was present in court and reviewed the video of Ms. Garrett's as she entered the store and fell.

This court further explained:

> The factors to consider in an appellate review of an allocation of **fault** were addressed by the Louisiana Supreme Court in *Watson v. State Farm Fire & Casualty Insurance Co.,* 469 So.2d 967 (La.1985). Therein, the supreme court stated:
>
>> [V]arious factors may influence the degree of **fault** assigned, including: (1) whether the conduct resulted from inadvertence or involved an awareness of the danger, (2) how great a risk was created by the conduct, (3) the significance of what was sought by the conduct, (4) the capacities of the actor, whether superior or inferior, and (5) any extenuating circumstances which might require the actor to proceed in haste, without proper thought. And, of course, as evidenced by concepts such as last clear chance, the relationship between the **fault**/negligent conduct and the harm to the plaintiff are considerations in determining the relative **fault** of the parties.
>
> *Id.* at 974.
>
> Prior to articulating the foregoing standard, the supreme court in *Watson* noted that "appellate review of facts is not completed by reading so much of the record as will reveal a reasonable factual basis for the **finding** in the trial court." *Id.,* 469 So.2d at 972, citing *Arceneaux v. Domingue,* 365 So.2d 1330, 1333 (La.1978). It further held that proper review requires the appellate court to determine whether that **finding**, even if supported by evidence, was clearly wrong or manifestly erroneous. *Watson,* 469 So.2d at 972.

*Burtner v. Lafayette Par. Consol. Gov't*, 14-1180, pp. 6-7 (La.App. 3 Cir. 4/15/15), 176 So.3d 1056, 1061-62, *writ denied*, 15-0938 (La. 6/19/15), 169 So.3d 350.

Following review, though we may have ruled differently on the issue were we the trial judge, we find no manifest error in the trial court's attribution of 100% of the fault to Dollar General. It is unquestioned that, as Dollar General points out, Ms. Garrett visited the store on a rainy day, wore flip-flops, and held her collapsed umbrella in front of her as she entered the store. The trial court cannot be said to have erred in failing to find that any of those actions breached any type of duty of care owed by Ms. Garrett, a patron of the store, or that she acted unreasonably in her conduct. Each of her actions are instead routinely taken by customers on inclement weather days. Strikingly, Dollar General points to no jurisprudence suggesting that Ms. Garrett acted unreasonably in any of those actions. This is especially so since Dollar General placed its shopping carts for customer use immediately to the left of the entrance and Ms. Garrett walked immediately to access the cart just as she entered the store. She slipped on the tile floor where the carts were located.

Rather, after hearing the testimony of the witnesses and being presented with Manager Romero's contemporaneously prepared "Customer Incident Report," which listed the cause of the incident as "wet conditions including wet floor," the trial court, by its judgment, rejected Dollar General's position that Ms. Garrett breached an applicable duty. The trial court was able to view the surveillance video of the accident which fully revealed the conduct of both Dollar General and Ms. Garrett. We find no manifest error in the trial court's determination and leave its judgment undisturbed.

## DECREE

For the foregoing reasons, the trial court judgment of December 30, 2020 is affirmed. Costs of this proceeding are assessed to Defendant/Appellant DG Louisiana, LLC.

**AFFIRMED.**